Charles T. BUGGS, Plaintiff,

v.

Donald E. POWELL, Chairman, Federal Deposit Insurance Corporation, Defendant.

Civil Action No. 01–0721 (RBW).

United States District Court, District of Columbia.

Nov. 19, 2003.

David H. Shapiro, Ellen Kyriacou Renaud, Swick & Shapiro, Heidi Rhodes Burakiewicz, Woodley & McGillivary, Washington, DC, for Plaintiff.

Heather D. Graham–Oliver, Lisa Barsoomian, U.S. Attorney's Office, Washington, DC, for Defendant.

### MEMORANDUM OPINION

WALTON, District Judge.

This matter comes before the Court upon the defendant's motion for summary

judgment. The plaintiff, Charles T. Buggs, was hired by the Federal Deposit Insurance Corporation ("FDIC") in 1980 and was employed as a Management Analyst in the FDIC's Corporate Support Branch. Complaint ("Compl.") ¶ 4. The plaintiff asserts that he was subjected to racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. × 2000e, *et seq.*, as a result of the FDIC's decisions not to promote him to several different positions that he applied for and by rating him as merely "Fully Successful" rather than as "Outstanding" on four of his performance evaluations. Compl. ¶¶ 8–13. Upon consideration of the parties' papers and for the reasons set forth below, the Court will grant in part and deny in part the defendant's summary judgment motion.

## I. *Factual Background*

In 1980, the plaintiff was hired by the FDIC at Grade 12 level, and he remained as an employee of the FDIC until his retirement on September 30, 2002, at Grade 13 level. Defendant's Local Rule 7.1(h) Statement of Material Facts as to Which There is No Genuine Issue ("Def.'s Facts") ¶ 1. In 1995, the plaintiff applied for but was not selected for the Grade 14 level position as Chief of the Corporate Support Branch. *Id.* ¶ 2. He subsequently filed a complaint of race discrimination, and in January 1998, the parties settled the dispute. *Id.* In September 1997, the FDIC posted a vacancy announcement for "two Grade 14 Senior Management Analyst positions in the Management Review Staff ("MRS") of FDIC's Division of Administration ("DOA")." *Id.* ¶ 3. The plaintiff applied for this vacancy and while the FDIC determined that he was one of eleven individuals qualified for the positions, it did not select him. *Id.* ¶¶ 3–8. The selecting official, Paul Sherman, who is white, selected a white male and an Asian–American male for the positions. Compl. ¶ 9. In May 1998, the plaintiff filed a second complaint alleging race discrimination because of his non-selection. Def.'s Facts ¶ 9. Then, in April 1998, the FDIC posted another position vacancy announcement for the Grade 13/14 position of Chief, Facilities Planning Group in the DOA. *Id.* ¶ 11. The plaintiff, along with fifty-four other individuals, applied for this position. *Id.* ¶ 12. Although the plaintiff was one of thirty-eight candidates deemed qualified for this position and was one of the individuals interviewed by the selecting official, he was not selected for this position. *Id.* ¶¶ 14–15. The selecting official, Robert Brandon, who is white, selected a white female, Marianne Jentilucci. Compl. ¶ 10. Michael Rubino, a white male, approved this selection. *Id.* Upon learning about his non-selection for this position, the plaintiff filed another complaint in October 1998, alleging racial discrimination. Def.'s Facts ¶ 15. In April 1999, the FDIC posted another position vacancy announcement for the Grade 15 position of Chief, Buildings Operation Unit in the DOA. *Id.* ¶ 18. Three individuals applied for this position, including the plaintiff, and all three applicants were determined to be qualified for the position. *Id.* ¶ 19. After considering the applicants' paper applications, the selecting official, Mr. Rubino, chose another candidate, Mr. Brandon, who as previously mentioned is white. *Id.* ¶ 20; Compl. ¶ 12. In September 1999, the plaintiff filed yet another complaint wherein he again alleged that he had not been selected for the position because of his race. Def.'s Facts ¶ 21. In October 1999, the FDIC posted a position vacancy announcement for the Grade 13/14 position of Chief, Space Planning and Design Unit in the DOA. *Id.* ¶ 22. The plaintiff, along with five other individuals, applied for this position. *Id.* ¶ 23. After determining that all of the applicants were qualified and then interviewing them,

the selecting official, Ms. Jentilucci, did not choose the plaintiff for this promotion, but instead selected another white female, Gwenn D'Anton. *Id.* ¶ 24; Compl. ¶ 13. Upon learning of his non-selection, the plaintiff filed an amendment to his previously filed complaint for racial discrimination regarding his non-selection for the Buildings Operations position. Def.'s Facts ¶ 25.

In addition to the plaintiff's complaints regarding his non-selection for the several positions that he applied for, he has also asserted a claim of discrimination based upon not receiving higher performance evaluations. In each of his four yearly evaluations from October 1997 to August 2001, the plaintiff received various numerical ratings, which resulted in a "Fully Successful" ranking. *Id.* ¶¶ 30–38. Two higher ratings exist which the plaintiff could have received as an FDIC employee: Outstanding and Superior. *Id.* ¶ 30.

## II. *Standard of Review: Summary Judgment*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In assessing a summary judgment motion, the Supreme Court has explained that a trial court must look to the substantive law of the claims at issue to determine whether a fact is "material," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And a "genuine issue" of fact is "one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action." *Sanders v. Veneman,* 211 F.Supp.2d 10, 14 (D.D.C.2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

While it is understood that when considering a motion for summary judgment a court must "draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true," *Greene v. Amritsar Auto Services Co.,* 206 F.Supp.2d 4, 7 (D.D.C.2002) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505), the non-moving party must establish more than "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. To prevail on a summary judgment motion, the moving party must demonstrate that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The District of Columbia Circuit has stated that the non-moving party may not rely solely on mere conclusory allegations. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993). Thus, "[i]f the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

## III. *Legal Analysis*

### (A) *The Plaintiff's Race Discrimination Claims*

Claims under Title VII which are pursued in the absence of direct evidence of discrimination are analyzed under the familiar burden-shifting test articulated in the seminal case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Morgan v. Fed. Home Loan Mortgage Corp.,* 328 F.3d 647, 650 (D.C.Cir.2003) (citations

omitted). To establish a prima facie case without direct evidence of discrimination, a plaintiff must demonstrate "that: '(1) [ ]he is a member of a protected class; (2)[ ]he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Stella v. Mineta,* 284 F.3d 135, 145 (D.C.Cir.2002) (quoting *Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999)). If the plaintiff is able to establish his prima facie case by a preponderance of the evidence, the burden of production switches to the employer to "articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 144 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). If the employer is able to satisfy this burden of production, "it [effectively] rebuts the plaintiff's prima facie case, and the presumption of discrimination created by the prima facie case 'drops out of the picture.'" *Teneyck v. Omni Shoreham Hotel,* 254 F.Supp.2d 17, 20–21 n. 3 (D.D.C.2003) (Walton, J.) (quoting *Dunaway v. Int'l Bhd. of Teamsters,* 310 F.3d 758, 762 (D.C.Cir.2002) (citation omitted)). "The plaintiff must then demonstrate that the employer's stated reason was pretextual and that the true reason was discriminatory." *Stella,* 284 F.3d at 144 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817). In *Aka v. Washington Hospital Center,* 156 F.3d 1284 (D.C.Cir.1998) (en banc), the District of Columbia Circuit examined the Supreme Court's decision in *St. Mary's Honor Center* "in some detail, as [it represented at that time] the [Supreme] Court's most recent explication of the workings of the *McDonnell–Douglas* framework." *Aka,* 156 F.3d at 1289. The *Aka* Court noted that once the plaintiff establishes his prima facie case and

> the employer has met its burden of producing a nondiscriminatory reasons for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment). That is not to say that every plaintiff must always present evidence in each of these categories in order to avoid summary judgment.

*Id.* In assessing whether the plaintiff has met his "burden of showing that a reasonable jury could conclude that [he] had suffered discrimination and accordingly summary judgment is inappropriate[,]" a court "must consider all the evidence in its full context[.]" *Id.* at 1290. The *Aka* Court concluded that "[a]lthough we find that rebuttal evidence alone will not always suffice to permit an inference of discrimination, we do not endorse a reading of *Hicks* under which employment discrimination plaintiffs are presumptively required to submit evidence over and above such a rebuttal in order to avoid summary judgment." *Id.* at 1292. In reaching this conclusion, the Circuit Court rejected a position taken by the First Circuit in *Hidalgo v. Overseas Condado Insurance Agencies, Inc.,* 120 F.3d 328 (1st Cir.1997), stating:

> the *Hidalgo* court believed that employment-discrimination plaintiffs must as a routine matter do more than discredit the employer's explanation in order to avoid summary judgment. That assumption we think would be inconsistent with *Hicks,* which makes clear that 'no

additional proof of discrimination is required' as a matter of course once a plaintiff has shown that a jury could reject the employer's proffered explanation.

156 F.3d at 1292 (quoting *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742) (citations omitted).

In this case, the plaintiff has filed claims of racial discrimination based upon his non-selection for a number of positions. The defendant has conceded that "for the purposes of this motion, plaintiff can establish a prima facie case of discrimination with respect to race." Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem.") at 17. However, the defendant asserts that there was a nondiscriminatory reason for each of the decisions not to promote the plaintiff. The Court will address each non-selection decision separately.

### (1) *The Plaintiff's Application for the Senior Management Analyst Positions*

■ While it appears from the plaintiff's complaint that he claims that his non-selection for the two Senior Management Analyst positions in September 1997 was the result of racial discrimination, *see* Compl. ¶ 9, the Court concurs with the defendant's assessment that the plaintiff has failed to respond to the defendant's motion for summary judgment on this claim. *See* Defendant's Reply to Plaintiff's Oppositions to Defendant's Motion for Summary Judgment ("Reply") at 11. The defendant asserts that the plaintiff was not selected for the two Senior Management Analyst positions because he was not as qualified as the individuals who were selected. Def.'s Mem. at 21–25.

■ This Court's Local Rule 7(b) states: Within 11 days of the date of service or at such other time as the court may direct, an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion. *If such a memorandum is not filed within the prescribed time, the court may treat the motion as conceded.*

Rules of the United States District Court for the District of Columbia, LCvR 7(b) (emphasis added). It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded. *FDIC v. Bender,* 127 F.3d 58, 67–68 (D.C.Cir.1997); *Stephenson v. Cox,* 223 F.Supp.2d 119, 121 (D.D.C.2002). The District of Columbia Circuit has stated that "the discretion to enforce ... [R]ule [7(b) ] lies wholly with the district court[,]" *Bender,* 127 F.3d at 67–68 (citing *Twelve John Does v. District of Columbia,* 117 F.3d 571, 577 (D.C.Cir.1997)), and noted that it "ha[s] yet to find that a district court's enforcement of this rule constituted an abuse of discretion." *Id.* (citations omitted). Accordingly, because the plaintiff had the opportunity to respond to all of the challenges to the claims in his complaint, the Court will construe his failure to respond to the defendant's assertion regarding why he was not selected for the two Senior Management Analyst positions as a concession that the selected candidates were more qualified.

### (2) *The Plaintiff's Application for Chief of the Facilities Planning Group*

■ The defendant asserts that Marianne Jentilucci was selected for the position of Chief of Facilities Planning Group instead of the plaintiff because she was the more qualified candidate. Def.'s Mem. at 25–27. Robert Brandon, the selecting official, stated that he

already had a good idea of all the internal applicants within our branch who would possibly apply. I had a good knowledge of their strengths and weaknesses. I knew I wanted a *very strong manager* who had a basic knowledge of AutoCAD which is a software package used primarily by architects and space designers/planners. I also thought the person should have a good understanding of design, construction and space planning which would give them the knowledge to understand construction drawings and plans allowing them to deal with large construction contracts. *Id.* at 26 (citing Def.'s Mem., Exhibit ("Ex.") 16 (Brandon EEO Affidavit)) (emphasis added). In his deposition, Mr. Brandon stated that he told the plaintiff that he "was looking for a very strong manager . . . [and that he] doubted [the plaintiff] had the managerial experience to handle [the position]." Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"), Ex. 4 (Brandon Deposition) at 115. Mr. Brandon went on to explain that he had never observed the plaintiff's managing skills, but that he was not "very forceful around" him. *Id.*

In *Aka,* the District of Columbia Circuit stated that "although employers may of course take subjective considerations into account in their employment decisions, courts traditionally treat explanations that rely heavily on subjective considerations with caution." 156 F.3d at 1298. In this case, it is clear that Mr. Brandon relied, at least in part, on his subjective determination about the applicants' personalities. The Court has concerns not only with the subjectiveness of the decision, but more importantly with the selecting official's description of the personality characteristics of the applicant he selected. Mr. Brandon testified during his deposition that Ms. Jentilucci's "personality is a little quieter. She's not quite as forceful in an interview

process. She seemed a little—while not meek, but more on the meek side." Pl.'s Opp'n, Ex. 4 at 110. Nonetheless, Ms. Jentilucci was selected for the position.

This evidence raises the question of whether a reasonable juror could conclude from it that the defendant's nondiscriminatory reason for not selecting the plaintiff was a pretext and, in conjunction with the prima facie case, permits an inference of racial discrimination. *See Reeves v. Sanderson Plumbing Prod.,* 530 U.S. 133, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer's asserted justification is false"). Here, it appears that while the selecting official's assessment that the plaintiff was not a "very forceful" individual was an important consideration in the decision not to select him for the position, Pl.'s Opp. Ex. 4 at 115, the selecting official's perception that Ms. Jentilucci was "on the meek side[,]" *id.* at 110, obviously did not preclude her from being selected for this position. Accordingly, the Court finds that a reasonable juror could decide that the defendant's proffered reason was pretextual and therefore must deny the defendant's motion for summary judgment with respect to this claim.

### (3) *The Plaintiff's Application for the Chief of the Building Operations Unit*

█ The defendant asserts that the selecting official, Michael Rubino, selected Robert Brandon for the position of Chief of the Building Operations Unit because he was the superior candidate. Def.'s Mem. at 27–28. The defendant has provided the Court with a copy of a February 2001 affidavit that Mr. Rubino had given in connection with the FDIC's Equal Em-

ployment Opportunity ("EEO") investigation, in which Mr. Rubino explained that "[b]oth Mr. Buggs and Mr. Brandon possess the minimum qualifications required for this position. However, Mr. Brandon's application package more fully demonstrated his qualifications...." Def.'s Mem., Ex. 43 (Rubino Affidavit). The plaintiff counters by noting that in a November 2002 deposition taken in this case, Mr. Rubino did not seem to recall very much about the application process for this position. Pl.'s Opp'n at 29. In fact, Mr. Rubino testified that he did not even recall the plaintiff applying for this position. Pl.'s Opp'n, Ex. 10 (Rubino Deposition) at 56. When asked if he had any memory about whether he considered the plaintiff for this position, Mr. Rubino testified "No, I just don't remember details about the selection for the particular position, other than who was selected. I do remember Robert [Brandon] being selected." *Id.* When specifically asked about the plaintiff's qualifications, Mr. Rubino stated "I wasn't—Mr. Buggs was several supervisory levels below me in the organization. I was not familiar with his qualifications, his experience, or his performance. Just not familiar with them." *Id.* at 57.

While the selecting official's assessment of the plaintiff's and Brandon's qualifications as represented in his February 2001 affidavit supports the defendant's position that Brandon was more qualified than the plaintiff, the selecting official's deposition suggests something different. When deposed approximately a year and a half after providing the affidavit, this same official testified that he was completely unfamiliar with the plaintiff's qualifications. This apparent contradiction leads the Court to the conclusion that a reasonable juror could find that the plaintiff's qualifications were never seriously considered by the official and that the defendant's articu-

lated reason for selecting Brandon was pretextual.

### (4) *The Plaintiff's Application for Chief of the Space Planning and Design Unit*

■ The defendant asserts that the selecting official, Marianne Jentilucci, chose Gwen D'Anton instead of the plaintiff for the position of Chief of the Space Planning and Design Unit because she was a more qualified candidate. Def.'s Mem. at 28–29. In an affidavit given in connection with the plaintiff's EEO investigation, Ms. Jentilucci discussed Ms. D'Anton's qualifications and then stated that

[a]s I recall, in his interview Mr. Buggs talked about his past military experience where he had leadership roles. However, I sometimes had trouble following his explanations. He seemed to have a broad administrative background but not too much technical expertise. I recall that he has a lot of background in supply and logistics and facilities management more so than in space planning. I believed that Ms. D'Anton was better qualified.

*Id.*, Ex. 36 (Jentilucci Affidavit). Ms. Jentilucci's deposition testimony is not only consistent with her affidavit, but is also significant because she states that she read through all of the applications. *Id.*, Ex. 37 (Jentilucci Deposition). Nonetheless, the plaintiff contends that

[c]learly, Ms. Jentilucci did not review Buggs' SF 171 before the interview and therefore was unfamiliar with the breadth and length of his experience. She appears to hold it against him that his career was long and complex. Based on the evidence and Jentilucci's confusion with Buggs' military experience, a reasonable juror could find that during his forty-year career, Mr. Buggs mastered several skills, including supply, lo-

gistics, facilities management, as well as space planning.

Pl.'s Opp'n at 31.

The District of Columbia Circuit has stated that "Title VII ... does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions." *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C.Cir. 1999). In *Aka*, the Circuit stated that

[i]n cases involving a comparison of the plaintiff's qualifications and those of the successful candidate, we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone. In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call. But this does not mean that a reasonable juror would in every case defer to the employer's assessment. If that were so, no job discrimination case could ever go to trial. *If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate*—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

156 F.3d at 1294 (internal citation omitted) (emphasis added). In *Odom v. Frank*, 3 F.3d 839 (5th Cir.1993), the Fifth Circuit stated that "unless disparities in [applications] are so apparent as virtually to jump off the page and slap us in the face, we judges should be reluctant to substitute our views for those of the individuals charged with [making employment related decisions] by virtue of their own years of experience and expertise in the field in question." *Id.* at 847. The opinion in *Vasilevsky v. Reno*, 31 F.Supp.2d 143 (D.D.C.1998), is also instructive. In *Vasilevsky*, this Court's colleague (Judge Urbina) granted the defendant's motion for summary judgment because the plaintiff had failed to demonstrate that the defendant's stated reason for her non-selection was a pretext. In that case, the plaintiff, among other things, had attempted to show the defendant's pretext by comparing her qualifications to those of the selected candidate. *Id.* at 149–50. Finding that the plaintiff's argument was flawed, Judge Urbina stated

[i]t is the plaintiff's duty to put forth evidence of discrimination, not to 'quibble about the candidates' relative qualifications.' *Skelton v. ACTION*, 668 F.Supp. 25, 27 (D.D.C.1987). It is not within the court's province to second-guess an employer's choice of candidates. *See id.* Even if the plaintiff did prove that she were better qualified that, without more, would indicate nothing more than the defendant made a faulty hiring decision. *See id.* at 26–27. Such evidence would not indicate that the plaintiff failed to obtain the position in question because of her age. *See id.* at 27. 'Unless the employer's choice of candidates can be shown to have been tainted by unlawful discrimination, it must be allowed to stand, no matter how unwise it may seem to the disappointed applicant.' *See id.* Consequently, the plaintiff's opinion of the relative merits of her credentials as opposed to those of the selected individuals are irrelevant.

*Vasilevsky*, 31 F.Supp.2d at 150.

In this case, the Court finds that nothing in the record suggests that a reasonable

juror could decide that the defendant's proffered reason was pretextual. The plaintiff asserts that the selecting official must not have given his application full consideration because: (1) she was confused about his explanations about his work experience during his interview and (2) a review of his SF 171 demonstrates how qualified he was in the areas of "supply, logistics, facilities management, as well as space planning." Pl.'s Opp'n at 30–31. However, the Court finds that nothing in the record would permit a reasonable juror to find that the FDIC never seriously considered the plaintiff's qualifications and the defendant's articulated reason that the successful candidate was more qualified was pretextual.

First, the selecting official definitively stated that she reviewed all of the applications. Second, the fact that the selecting official was "confused" about the explanation provided by the plaintiff during his interview about his prior work experiences does not support an inference of discrimination. Finally, the Court finds that a comparison of the vacancy announcement for this position with the qualifications of the plaintiff and the successful applicant does not permit an inference of discrimination. The vacancy announcement indicated:

> The Space Planning and Design Unit provides client-oriented services related to the planning and development of all FDIC facilities, including participation in site selection, lease administration, space design and construction. The incumbent will supervise and manage a staff of design and build-out professionals who carry out all aspects of the Corporation's facility planning program. Specific duties include: Establishes Corporate-wide policies and standards governing the design, construction and furnishing of al FDIC owned and leased facilities. Interprets latest Federal and

industry standards for incorporation into FDIC's facility design manual and provides expert advice and direction [to] headquarters and regional facility managers. Evaluates and institutes changes to improve the effectiveness of FDIC facility programs with a view toward achieving maximum utilization of space, materials and budget resources.... Reviews and approves construction drawings and specifications....

Def.'s Mem., Ex. 33 (Vacancy Announcement for Chief, Space Planning & Design Unit). In explaining why she did not choose the plaintiff for the position, the selecting official stated that she felt the plaintiff had greater work experiences in the areas of supply and logistics and facilities management rather than in space planning, and that Ms. D'Anton was more qualified in that respect. Def.'s Mem., Ex. 36. This is not a situation like the one the *Aka* Court tendered by way of illustration as an example of pretext: "a plaintiff can attempt to show that the employer's explanation misstates the candidates' qualifications. Thus, if the employer says that it did not hire the plaintiff because he did not speak Portuguese, the plaintiff can show that he *did* speak Portuguese, and that the employer knew it." 156 F.3d at 1295 (emphasis in the original). While a reasonable juror could infer pretext and a discriminatory motive in that context, here, the defendant is not stating that the plaintiff did not have any experience in space planning, but that he had more experience in supply, logistics and facilities management, rather than in space planning. Thus, this Court must review whether the employer could legitimately conclude that the plaintiff had more experience in supply and logistics and facilities management, rather than in space planning, and second compare the SF 171s submitted by the plaintiff and Ms. D'Anton in assessing whether a reasonable

juror could find that the defendant's stated reasons for not selecting the plaintiff were a pretext.

Upon examining the SF 171s, this Court is unable to state that a reasonable juror could decide that the defendant's proffered reason was pretextual. While it is clear that the plaintiff does have some space planning experience, the actual descriptions of his past work experiences reflects that a significant part of his experience has been in areas other than space planning. On the other hand, an examination of Ms. D'Anton's SF 171 reveals that she has substantial space planning experience. For example, in her previous position as a management analyst in FDIC's Space Planning and Design Unit for approximately three years, Ms. D'Anton was

[r]esponsible for reviewing and modifying the Corporations Facilities Design Guide to include changes and updates based upon [her] interpretation of the latest design standards. Manage[d] large ... and small scale construction and refurbishing projects for the Corporation, working with the facilities managers to supervise the building trades and contractor services, including construction, furniture procurement and installation, and moving services to insure that all applicable building codes, safety measures and FDIC building standards [were] met. Develop[ed] corporate space designs using AutoCAD software and standardized design and construction specifications. Review[ed] and approve[d] construction drawings and specifications for large scale ... and small scale projects for the Corporation. Recommend[ed] assignment and use of building space to supervisory and senior level management. Prepare[d] and [made] recommendations for long term housing master plan for the Corporation by monitoring space availability within

the owned and leased buildings of the Corporation. . . .

Def.'s Mem., Ex. 38 (D'Anton SF 171). In her previous position as Chief of the Space Management Section for the Resolution Trust Corporation ("RTC"), a position Ms. D'Anton held for approximately three years, she

directed a comprehensive space planning and analysis program for RTC occupants of multiple Corporation office sites in the Washington, D.C. area and field locations. Supervised a staff of four professional Federal employees and a large number of contractor personnel. Directed the study and analysis of Corporate space requirements, and recommended acquisition of new leased space. Identified problems in administration of existing space policies and developed programs and proposals to improve effectiveness in the utilization of facilities. Analyzed office functions, work flow patterns, and determine[d] office space requirements and layouts of interior space. Evaluated specialized space requirements of the corporation and develop[ed] comprehensive programs to meet unique facility and space needs of top management and program officials. . . . Directed and maintain[ed] furniture acquisition and inventory for use at RTC buildings. Directed construction and relocation of the program offices.

*Id.* Finally, in the position Ms. D'Anton held immediately before being promoted to the position of Chief of the Space Management Section for the RTC, she was a Management Analyst at the RTC for approximately one year, where she

[a]nalyzed space needs and devised solutions by providing professional support in space management of multiple RTC locations. Evaluated space requirements for RTC personnel and develop[ed] solutions to effectively

maximize space utilization. Maintained liaison with administrative, managerial and executive personnel and developed solutions to effectively maximize space utilization. Devised strategies and schedules to implement relocations....

*Id.* The Court also finds it noteworthy that Ms. D'Anton is a licensed interior designer, receiving her bachelors or arts degree from the University of Maryland, where she majored in Art History/Interior Design. *Id.;* Def.'s Mem., Ex. 37.

From this record, the Court cannot find that a reasonable juror could conclude that the plaintiff's qualifications were "significantly better" than the successful candidate's qualifications. *Aka,* 156 F.3d at 1294. And there being nothing else in this record that would support a finding of pretext concerning the selection of Ms. D'Anton, the Court must grant the defendant's summary judgment motion with respect to this claim.

**(B)** *The Plaintiff's Retaliation Claims*

■ The plaintiff asserts in his complaint that the defendant's failure to select him for the aforementioned positions and to give him higher performance evaluations were acts of retaliation committed by the defendant due to the plaintiff's complaints about his non-selections to those positions. Compl. ¶ 18. To establish a prima facie case of retaliation under Title VII in this Circuit, a plaintiff must demonstrate that (1) he engaged in EEO-protected activity; (2) he was subject to adverse action by his employer; and (3) there is a causal connection between the protected activity and the adverse action. *Paquin v. Fed. Nat'l Mortgage Ass'n,* 119 F.3d 23, 31 (D.C.Cir.1997). Upon establishing a prima facie case, the *McDonnell Douglas* burden-shifting analysis is similarly applicable to retaliation claims, as the burden of production switches to the employer to estab-

lish a legitimate, non-discriminatory reason for its actions, and, if successful, the plaintiff must then establish that the employer's stated reason is a pretext for discrimination. *Cones v. Shalala,* 199 F.3d 512, 521 (D.C.Cir.2000). Here, the defendant has conceded that the plaintiff is able to establish the first two elements of the prima facie case for retaliation, but asserts that the plaintiff has failed to demonstrate a causal link between the protected activity and his non-selection to the several positions. Reply at 20–21.

At the outset, the Court notes that it construes the plaintiff as having conceded that his non-selection for the two Senior Management Analyst positions in September 1997 was not a result of retaliation. This conclusion has been reached by the Court because the plaintiff acknowledges that the "[d]efendant correctly states that Buggs has not established temporal activity between his *initial* protected activity and the adverse actions at issue here." Pl.'s Opp'n at 21 (emphasis in the original). The plaintiff then goes on to state that his claim of discrimination related to his non-selection for the Senior Management Analyst positions serves as the predicate for the protected activity for which he was subjected to retaliation by his non-selection to the position of Chief of the Facilities Planning Group. *Id.* at 22.

**(1)** *Is there a Causal Connection Between the Protected Activity and the Positions for Which the Plaintiff was not Selected?*

**(a)** *Temporal Proximity*

■ As to the plaintiff's remaining claims of retaliation, the parties focus their arguments on the third element of the prima facie case—causation—and the temporal proximity between the plaintiff's claims of discrimination and his non-selections for the positions of Chief of Facilities

Planning Group, Chief of the Building Operations Unit, and Chief of the Space Planning and Design Unit. In *Clark County School District v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam), the Supreme Court stated that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that temporal proximity must be 'very close[.]'" *Id.* at 273, 121 S.Ct. 1508 (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997) (holding a 3–month period to be insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–75 (7th Cir.1992) (holding a 4–month period to be insufficient)). In *Brodetski v. Duffey*, 141 F.Supp.2d 35 (D.D.C.2001), another member of this Court commented that "[a]lthough courts have not established the maximum time lapse between protected Title VII activity and alleged retaliatory actions for establishing a causal connection, courts generally have accepted time periods of a few days up to a few months and seldom have accepted time lapses outside of a year in length." *Id.* at 43 (citing *Devera v. Adams*, 874 F.Supp. 17, 21 (D.D.C.1995) (holding that "an eight month interval between the two events is not strongly suggestive of a causal link"); *Castle v. Bentsen*, 867 F.Supp. 1, 3 (D.D.C. 1994) (holding that three to five months is a short enough time lapse between EEO activity and act of reprisal to establish a causal connection); *Garrett v. Lujan*, 799 F.Supp. 198, 202 (D.D.C.1992) (holding that almost a year "between plaintiff's EEO activity and the adverse employment decision is too great [a length of time] to support an inference of reprisal"); *Goos v. Nat'l Ass'n of Realtors*, 715 F.Supp. 2, 3–4 (D.D.C.1989) (holding that five weeks constituted a short enough time lapse to establish a causal connection). *But see Hayes v. Shalala*, 902 F.Supp. 259, 264 (D.D.C.1995) (holding that a causal connection existed based on the time plaintiff first became vulnerable to retaliation, even though that time occurred three years after plaintiff engaged in protected activity)). While the Supreme Court's language in *Breeden* on this issue is helpful, the Court finds that the cases cited for this proposition are more significant because they demonstrate how short the temporal proximity must be. This is because the cases cited by the *Breeden* Court seem to suggest that if a plaintiff relies upon temporal proximity *alone* to establish causation, the time span must be under three months. *See O'Neal*, 237 F.3d at 1253 (noting the Tenth Circuit has found "that a one and one-half month period between the protected activity and adverse action may, by itself establish causation ... [but] that a three-month period, standing alone, is insufficient to establish causation." However, the Tenth Circuit concluded that it did not have to address whether a two months and three weeks period was sufficient, by itself, to establish causation because there was additional evidence from which a reasonable juror could find causation.); *ONEOK*, 120 F.3d at 209 (affirming district court's conclusion that "three-month period of time between [plaintiff's] protected activity and termination was insufficient to establish a causal connection."); *Hughes*, 967 F.2d at 1174–75 (affirming district court's conclusion that four-month period between protected activity and adverse action, by itself, did not satisfy causation element for retaliation claim).

■■■ In this case, the temporal proximity between the plaintiff's protected activity and the adverse employment actions were as follows: (1) approximately two months between the filing of his complaint

in May 1998 due to his failure to be selected for the Senior Management Analyst positions and his subsequent non-selection for the position of Chief of Facilities Planning Group in July 1998; (2) approximately seven months between the filing of his complaint in October 1998 due to his failure to be selected as the Chief of Facilities Planning Group and his subsequent non-selection for the position of Chief of the Building Operations Unit in May 1999; and (3) approximately two months between the filing of his complaint in September 1999 due to his failure to be selected for Chief of the Building Operations Unit and his non-selection for Chief of the Space Planning and Design Unit in November 1999. While it is clear that a two-month time span between the protected activity and the purported act of retaliation is sufficiently temporal in proximity to give rise to an inference of discrimination, *see Breeden,* 532 U.S. at 273, 121 S.Ct. 1508, it is equally apparent that the seven-month span between the filing of the complaint in October 1998 and the plaintiff's failure to be selected as Chief of the Building Operations Unit in May 1999 is not, *by itself,* sufficient to establish an inference of discrimination. However, as the First Circuit stated recently, "[t]emporal proximity is but one method of proving retaliation. Evidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection." *Che v. Mass. Bay Transp. Auth.,* 342 F.3d 31, 38 (1st Cir. 2003) (internal citations omitted). In *Kachmar v. SunGard Data Systems, Inc.,* 109 F.3d 173 (3d Cir.1997), the Third Circuit stated "that where there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference. These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Id.* at 177 (internal citation omitted).

Here, the proffered evidence as a whole, when viewed in the light most favorable to the plaintiff, creates an inference of retaliatory discrimination with respect to the plaintiff's non-selection as Chief of the Building Operations Unit, even though its proximity to the protected activity would not alone support such an inference. Of particular significance to the Court is that Mr. Rubino was the individual who approved Brandon's selection of Ms. Jentilucci as Chief of the Facilities Planning Group and was the same person who selected Brandon as Chief of the Building Operations Unit. And, Mr. Rubino was one of the targets of the plaintiff's discrimination complaint, which was filed because of his non-selection as Chief of the Facilities Planning Group position, and was the same individual who allegedly then retaliated against the plaintiff by not selecting him as Chief of the Building Operations Unit. Thus, the Court finds it noteworthy that at the same time Mr. Rubino was reviewing the plaintiff's application for Chief of the Building Operations Unit, which was submitted on May 18, 1999, *see* Def.'s Mem., Ex. 25 (Buggs SF 171), he was a target of an investigation initiated by the plaintiff alleging that he had discriminated against the plaintiff. On October 6, 1998, during an informal resolution attempt, an EEO counselor spoke to Rubino about the plaintiff's complaint regarding his non-selection for the Chief of the Facilities Planning Group. Pl.'s Opp'n, Ex. 20 (EEO Counselors Report). Then, on November 19, 1998, the EEO office informed the plaintiff that his complaint regarding his non-selection for the Chief of the Facilities Planning Group was under formal investigation. Def.'s Mot., Ex. 24 (November 19, 1998 EEO Letter to the Plaintiff). As part of

this investigation, the plaintiff submitted an affidavit on March 25, 1999, detailing his allegations of discrimination with respect to his non-selection for the Chief of the Facilities Planning Group position. Pl.'s Opp'n, Ex. 21 (Plaintiff's Affidavit). Then, Mr. Rubino submitted an affidavit on March 26, 1999, detailing his involvement in the non-selection of the plaintiff. Def.'s Mot., Ex. 43 (Rubino Affidavit). Subsequently, the plaintiff filed an addendum to his affidavit on April 3, 1999, to respond, in part, to the position that Rubino took in his affidavit. Pl.'s Opp'n, Ex. 21. The plaintiff then applied for the Chief of the Building Operations Unit on May 18, 1999, and was not selected by Rubino for the position shortly thereafter. The fact that Mr. Rubino was the subject of an on-going investigation at the same time that he was considering the plaintiff's application for Chief of the Building Operations Unit certainly gives rise to an inference of retaliatory discrimination. *See Cones*, 199 F.3d at 521 (in reversing the district court's grant of summary judgment to the defendant on the plaintiff's retaliation claim, the Circuit Court noted that at the same time the defendant had committed its adverse employment action, "an EEO counselor was investigating [the plaintiff's] informal discrimination complaint, and [the plaintiff] was filing formal complaints of both discrimination and retaliation.").

### (b) *Knowledge of the Protected Activity by the Selecting Officials*

 The defendant asserts that the plaintiff is unable to establish a prima facie case with respect to his non-selection for the position as Chief of the Facilities Planning Group because the selecting official, Robert Brandon, was unaware of plaintiff's prior protected activity until after Mr. Brandon had selected Marianne Jentilucci. Def.'s Mem. at 20. During his deposition,

Mr. Brandon was asked if he was "ever aware that Mr. Buggs had prior EEO activity, that he had filed any other EEO complaints against the FDIC?" Def.'s Mem., Ex. 42 at 138. Mr. Brandon responded that he became aware "after [Ms. Jentilucci's] selection. It was a while past that. I had heard that he had filed an EEO." *Id.* at 139. The plaintiff asserts that Brandon's response is "disingenuous" because "[i]t was common knowledge among FDIC managers that Buggs had filed numerous grievances against the organization—even reaching the level of water-cooler conversation." Pl.'s Opp'n at 23. As support for his position, the plaintiff relies upon Ms. Jentilucci's deposition testimony which states that Mr. Brandon had spoken about the plaintiff's EEO activity. However, an examination of her deposition testimony reveals that these conversations had to have occurred after Mr. Brandon made his selection for Chief of the Facilities Planning Group in July 1998 because Ms. Jentilucci heard these conversations while employed at the FDIC, where she did not begin to work until August 1998. *See* Def.'s Mem., Ex. 36 (Jentilucci Affidavit). Accordingly, the plaintiff's reliance on Ms. Jentilucci's deposition testimony as proof of pretext with respect to Mr. Brandon's deposition testimony that he was unaware of the plaintiff's prior protected activity when he failed to select him for the position of Chief of the Facilities Planning Group in July 1998 is without merit. Thus, because the record indicates that the selecting official was unaware of the plaintiff's prior protected activity when he decided not to select him for the position of Chief of the Facilities Planning Group, the plaintiff is unable to establish a prima facie case of retaliation as to this claim. *See Laboy v. O'Neill*, No. 01–5322, 2002 WL 1050416, at *1 (D.C.Cir. March 13, 2002) ("because the official responsible for order-

ing appellant's termination was unaware of appellant's prior EEO activity, appellant failed to establish a prima facie case of retaliation") (citing *Breeden,* 532 U.S. at 272–73, 121 S.Ct. 1508) ("alleged discriminating official's knowledge of prior equal employment opportunity (EEO) activity must precede official's contemplating adverse action"); *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985) ("The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."); *Chandamuri v. Georgetown Univ.,* 274 F.Supp.2d 71, 85 (D.D.C.2003) ("To prove that a causal connection existed between his activities and the alleged retaliatory action, [the plaintiff] must demonstrate that [the employer] knew of his protected activity and that the retaliation closely followed the protected activity.").

Turning to the plaintiff's remaining claims of retaliation regarding his non-selection for the positions of Chief of the Building Operations Unit and Chief of the Space Planning and Design Unit, the Court finds that it is undisputed that the selecting official knew of the plaintiff's prior protected activity before deciding not to select him for the former position and that there is genuine issue of material dispute regarding when the selecting official for the latter position knew of the plaintiff's prior EEO activity. This is because Mr. Rubino, the selecting official for the position of Chief of the Building Operations Unit, acknowledges in an affidavit that "[a]t the time [he] made the selection for [this] . . . position, [he] was aware of Mr. Buggs' race and gender, and that he had prior EEO activity." Def.'s Mem., Ex. 30 (Rubino EEO Affidavit). And, the selecting official for the position of Chief of the Space Planning and Design Unit, Ms. Jen-

tilucci, states in an affidavit that she "do[es] not recall exactly when (before or after his interview) [she] became aware of Mr. Buggs EEO activity." Def.'s Mem., Ex. 36 (Jentilucci EEO Affidavit).

**(2)** ***Has the Defendant Articulated Legitimate, Non–Discriminatory Reasons for its Non–Selection Decisions?***

As this Court has already stated above, because the plaintiff has established prima facie cases of retaliation for his claims with respect to his non-selections for the positions of Chief of the Building Operations Unit and Chief of the Space Planning and Design Unit, the burden shifts to the defendant to articulate legitimate, non-discriminatory reasons for its decisions not to select the plaintiff. *Cones,* 199 F.3d at 521 (*McDonnell Douglas* burden-shifting test is applicable to retaliation claims). Here, the defendant has stated that each of the individuals who were selected for these two positions were more qualified than the plaintiff. Def.'s Mem. at 21–29. However, as this Court has set forth fully above, the Court has already concluded that a reasonable juror could find that the plaintiff's qualifications for the position of Chief of the Building Operations Unit were never seriously considered and the defendant's articulation that the person selected was more qualified was pretextual. And, with respect to the position of Chief of the Space Planning and Design Unit, the Court has already found that it is unable to conclude that a reasonable juror could either find that the selecting official's stated reason for not choosing the plaintiff was pretextual or, upon comparing the qualifications of the plaintiff and the successful candidate, that the plaintiff's qualifications were "significantly better" than the successful candidate's qualifications. *Aka,* 156 F.3d at 1294.

Accordingly, the Court will grant the defendant's summary judgment motion on the plaintiff's retaliation claims regarding his non-selection for the two Senior Management Analyst positions, Chief of the Facilities Planning Group, and Chief of the Space Planning and Design Unit. The Court, however, will deny the defendant's summary judgment motion on the plaintiff's retaliation claim regarding his non-selection for the position as Chief of the Building Operations Unit.

### (C) *The Plaintiff's Claims With Respect to His Performance Evaluations*

 Finally, the defendant requests summary judgment on the plaintiff's claims with respect to the ratings he received on four of his performance evaluations. Def.'s Mem. at 29–32. A review of the plaintiff's opposition to the defendant's summary judgment motion reveals that the plaintiff has failed to respond to the defendant's summary judgment motion on these claims. Accordingly, and for the reasons already fully set forth above, pursuant to Local Civil Rule 7(b), the Court construes the plaintiff's failure to address the defendant's assertions regarding the reasons why the plaintiff did not receive a rating higher than "Fully Successful" as concessions that these claims are without merit. *See Bender,* 127 F.3d at 67–68; *Stephenson,* at 121.

### IV. *Conclusion*

For aforementioned reasons, the Court will grant the defendant's motion for summary judgment with respect to the plaintiff's claims of race discrimination and retaliation regarding his performance evaluations and his failure to be selected for the two Senior Management Analyst positions and the position of Chief of the Space Planning and Design Unit. In addi-tion, the Court will grant the defendant's summary judgment motion with respect to the plaintiff's retaliation claim for his non-selection as Chief of the Facilities Planning Group. However, the Court will deny the defendant's requests for summary judgment on the plaintiff's race discrimination claim regarding his failure to be selected as Chief of the Facilities Planning Group and on the plaintiff's claims of race discrimination and retaliation regarding his failure to be selected for the position of Chief of the Building Operations Unit.[1]

**SO ORDERED.**

---

**1.** An Order consistent with the Court's ruling accompanies this Memorandum Opinion.