Ana **GUSTAVE–SCHMIDT,** Plaintiff,

v.

**Elaine L. CHAO, Secretary, Department of Labor, Defendant.**

**No. CIV.A.01–0781(RBW).**

United States District Court, District of Columbia.

March 30, 2004.

David Paul Murphy, Kooritzky & Associates, Arlington, VA, for Plaintiff.

Beverly Marie Russell, Roscoe Howard, Jr, U.S. Attorney's Office, Civil Division, Washington, DC, for Defendants.

## MEMORANDUM OPINION

WALTON, District Judge.

■ This matter comes before the Court upon Defendant's Motion for Summary Judgment ("Def.'s Mot."), which was filed following the issuance of this Court's decision in *Gustave–Schmidt v. Chao*, 226 F.Supp.2d 191 (D.D.C.2002), granting in part and denying in part the defendant's motions for partial dismissal of the plaintiff's complaint. In that Memorandum Opinion, this Court dismissed the plaintiff's claims for negligent and intentional infliction of emotional distress under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2401–680 (2000), and denied the defendant's motion to dismiss the plaintiff's claims for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (2000), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (2000), which had been challenged on the ground that the plaintiff had failed to exhaust her administrative remedies as to these discrimination claims. *Gustave–Schmidt*, 226 F.Supp.2d at 203–04. The defendant now seeks summary judgment on the plaintiff's discrimination, retaliation, and hostile work environment Title VII and ADEA claims.[1] Def.'s Mot., Memorandum of Points and Authorities in Support of De-

---

1. The Court notes that "[t]his circuit applies to ADEA cases the [same] scheme for allocat-

fendant's Motion for Summary Judgment ("Def.'s Mem.") at 1. Upon consideration of the parties' submissions and for the reasons set forth below, the Court will grant the defendant's motion for summary judgment.

## I. Factual Background

The plaintiff, a forty-eight year-old Hispanic woman, was employed as an international economist at the United States Department of Labor ("DOL") from March 10, 1991, to March 3, 2000.[2] Complaint ("Compl.") at 3; Statement of Material Facts as to Which There is No Genuine Dispute ("Def's Facts") at ¶ 1; Response to Defendant's Statement of Material Facts to Which There is Genuine Dispute ("Pl's Facts") at ¶ 1. The Court finds it helpful to briefly summarize the pertinent facts related to the plaintiff's claims of discrimination based on her non-selection for two positions, retaliatory discharge based on the filing of several grievances, and defendant's creation of a hostile work environment.

### (A) Plaintiff's Non–Selection for the Labor Economist Position (Vacancy 99–029)

From July 22, 1992, and until the termination of her employment with the defendant, the plaintiff worked at the DOL's Division of Economic Research in the International Labor Affairs Bureau ("ILAB").[3] Compl. at 3. On January 8, 1999, the plaintiff applied for a vacancy as a labor economist (Vacancy 99–029) in the ILAB and, according to the plaintiff, on January 11, 1999, the DOL allegedly modified the position description "from a GS–11/12 to a GS–11/12/13 to the advantage of an applicant outside of the DOL."[4] *Id.* at 6. Apparently, while the plaintiff was qualified for this position at all three of these GS levels, the DOL chose an applicant from outside of the ILAB who was "a white female under the age of forty years" and who did not yet have a Ph.D. degree like the plaintiff. *Id.* at 6–7. The defendant maintains that Susan Razzaz, the successful applicant, was selected on the basis of her expertise in the desired field.[5] Def.'s Mem. at 9. However, the plaintiff asserts that Razzaz's resume and job application lacked any specific mention of such expertise. Pl's Facts at ¶ 22.

### (B) Plaintiff's Non–Selection for the Economist Position (Vacancy 99–032) [6]

The plaintiff also applied for a position

---

ing evidentiary burdens that has evolved in Title VII discrimination cases." *Forman v. Small,* 271 F.3d 285, 292 (D.C.Cir.2001).

2. The plaintiff represents that at all times relevant to this case, she was over the age of forty. Compl. at 3.

3. The plaintiff's tenure also included an assignment with the International Labor Office of the United Nations in Geneva, Switzerland. Compl. at 4.

4. In fact, the plaintiff states that beginning on December 1, 1994, she applied for (and did not receive) at least eleven GS–13 positions within the ILAB. *Id.* at 6.

5. Razzaz was not the original applicant selected; however, the primary choice applicant declined the offer, and Razzaz was the alternate choice. Def.'s Mem. at 21.

6. The defendant did not request summary judgment on this claim in her summary judgment motion. However, in her Reply, she does seek summary judgment on the claim and that she did not oppose the plaintiff being permitted to file a Surreply to address this issue that was being raised for the first time. Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Reply") at 25 n. 12. Plaintiff ultimately filed a surreply.

as an economist (Vacancy 99–032).[7] While she made the list of eligible candidates, a white male younger than forty (40) years old was selected over the plaintiff. Plaintiff's Surreply to Defendant's Reply ("Surreply") at 23–25. The defendant asserts that the successful applicant "was selected for the position because of his experiences which were directly relevant to the duties of the advertised position." Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Reply") at 26. The plaintiff contends that she was the best qualified applicant for the position and that she "had objectively superior professional credentials (both educational and job experience) . . . ." Surreply at 24, 26.

### (C) Alleged Misrepresentation and Plagiarism by the Plaintiff

From at least September 1, 1994, and until her termination, the plaintiff's direct supervisor was Gregory Schoepfle ("Supervisor" or "Schoepfle"), the same individual who in 1992 both interviewed and hired the plaintiff from a pool of competitive candidates, including those who were male and non-Hispanic. Compl. at 6; Def's Facts ¶¶ 2–4; Pl's Facts ¶ 4. The defendant notes that "[d]uring the period relevant to this matter, all current economists within the Research Division, including plaintiff, had doctoral degrees." Def's

Mem. at 4 (internal citation omitted). Schoepfle, as the plaintiff's supervisor, was responsible for evaluating the plaintiff's performance in 1998–1999.

Three job-related papers submitted by the plaintiff were "considered as part of the plaintiff's evaluation review" by Schoepfle. Reply at 1; Def's Facts ¶ 5; Pl's Facts ¶ 5. Two of the papers, *Impact of the Asian Crisis on the World Economy* and *Free Trade of the Americas,* contained the plaintiff's by-line,[8] but, after careful review, the defendant considered them to be plagiarized. Reply at 1–2; Def's Facts ¶¶ 6, 11–13; Def's Mem. at 6, 8. However, the plaintiff disputes that she ever claimed authorship for these papers despite the appearance of her name on the covers. Pl's Facts ¶¶ 6, 8–9, 13, 18, 20.

The defendant maintains that "economists working in the Division undertook 'independent and original research to support and evaluate economic policy.'" Def.'s Mem. at 4 (internal citations omitted). Upon reading the aforementioned papers of the plaintiff, however, Schoepfle became suspicious of their quality on the basis of "strange word usages" and other oddities. Def.'s Facts ¶¶ 8–9. As a result, Schoepfle conducted his own research and subsequently found two papers nearly identical to those submitted by the plaintiff.[9] *Id.* ¶¶ 10–11; 13. Moreover, the plaintiff "failed to inform her supervisor

---

7. The parties dispute where this position was located. The defendant asserts it was located in the DOL's Office of Program Economics, *see* Reply at 26, while the plaintiff maintains it was located in the Office of the Secretary of Labor, *see* Plaintiff's Surreply to Defendant's Reply ("Surreply") at 24. For purposes of this motion, the Court finds the dispute is of no moment.

8. At least one of the papers, *Impact of the Asian Crisis on the World Economy,* contained a disclaimer, in addition to the plaintiff's name, on the cover which stated that "[t]he views expressed in [the] paper are solely those

of the author and may not necessarily reflect the positions of the U.S. Department of Labor." Def's Facts ¶ 6.

9. The *Impact of the Asian Crisis on the World Economy* paper was almost identical to a paper authored by the United Nations on the Asian financial crisis' effect on Latin America. Def's Facts at ¶¶ 10–11. The *Free Trade of the Americas* paper was nearly identical to one published by the Inter–American Development Bank on "western hemispheric integration." *Id.* at 13.

that she was not the author of the papers and also failed to provide appropriate attribution to the originating organizations." Reply at 1–2; Def's Facts ¶ 18.

The plaintiff, however, denies both that she ever claimed authorship of these papers and that she was responsible for "any of the independent research relating to the subject matter of th[e] document[s]." Pl's Facts ¶¶ 6, 8. Indeed, the plaintiff insists that it was part of her job "to bring documents from other international organizations and her Position Description did not require her to perform independent research ... [and] that she had been presenting these documents in this format for years." *Id.* ¶¶ 6, 8, 11. (internal citations omitted). The plaintiff posits that the Position Description relied upon by Schoepfle was not *her* position description and that the plaintiff's initials were forged on the copy of the Position Description produced by the defendant. *Id.* ¶ 14.

Nonetheless, because the plaintiff did not inform Schoepfle that she was not the author of the papers and that they had been prepared by other organizations, the defendant maintains that it was reasonable to conclude that the plaintiff misrepresented these papers as the result of her own independent research. Reply at 2. On October 13, 1999, Schoepfle proposed that the plaintiff be removed from her position, and, on November 23, 1999, Dr. Jorge Perez–Lopez ("Perez–Lopez"), Director of the Office of International Economic Affairs and the plaintiff's second line supervisor, supported this proposal after independently reviewing the same papers. Def's Facts ¶¶ 14–16. While Perez–Lopez acknowledged that the plaintiff had "no prior disciplinary history," he felt that "the ... wholesale copying of work done by others

was so serious an offense [that] ... termination was the appropriate action." Def's Facts ¶ 16 (citations omitted). In response, the plaintiff filed a grievance challenging her proposed removal. The grievance was submitted to arbitration and the DOL's decision to terminate the plaintiff was upheld by the arbitrator, whose decision was later sustained by the Merit Systems Protection Board. Def.'s Facts ¶ 17; Pl's Facts ¶ 17.

**(D)** *The Plaintiff's Hostile Work Environment Claim*

On October 17, 1997, the plaintiff was apparently questioned by two agents of the DOL's Office of Inspector General ("OIG") regarding whether she sent a forged letter that was represented to be from a high-level DOL employee to the President of the Inter–American Bank of Development ("IABD").[10] Compl. at 8. On July 7, 1998, during the course of this investigation, the plaintiff learned that two OIG agents wanted to speak to her and she apparently requested the presence of her Local 12, AFGE, AFL–CIO ("Local 12") union representative during the interview. However, after one of the OIG agents unsuccessfully attempted to contact the plaintiff's union representative, the plaintiff requested the presence of another union representative at the interview, which was allegedly denied by the OIG agents. *Id.* The plaintiff asserts that at this interview, the two OIG agents attempted to pressure her into signing a confession stating she had written the forged letter and had sent it to the President of the IABD. *Id.* Furthermore, the plaintiff alleges that the OIG failed to reasonably investigate the matter and that her Supervisor informed the agents that the signature and the use of expressions in

---

**10.** Apparently, this letter contains derogatory statements about a cousin of the plaintiff who is an employee at the IABD. *Id.* at 8.

the letter in question were similar to the plaintiff's handwriting and writing style, and pointed to a typewriter near the plaintiff's office which he said produced a similar "style of type" to that of the forged letter. *Id.* at 8–9. The plaintiff asserts that due to her Supervisor's statements to the OIG, she was the focus of the investigation into the origin of the forged letter. *Id.* at 9. On January 13, 1999, the plaintiff's Supervisor, and on June 11, 1999, the IALB Director, notified the plaintiff of their intention to suspend her for fourteen days without pay for authoring the forged letter. *Id.* at 10. In addition, plaintiff asserts that she definitively disproved the allegations regarding the forged letter when she provided handwriting and linguistic samples, as well as fingerprints to the defendant in October of 1999. Pl.'s Facts ¶ 24. The defendant admits that there was a proposal to suspend the plaintiff but points out that the proposed suspension was withdrawn in December of 1999. Def.'s Facts ¶ 24; Def's Mem. at 10. And, the defendant insists that "[t]he proposed suspension played no role in the decision to remove [the] plaintiff" from her job. Def.'s Mem. at 10 (citations omitted).

The plaintiff also asserts that on April 1, 1999, she was allegedly reprimanded by her Supervisor who shouted at her in close proximity to her fellow co-workers about a research paper that she had been working on. Compl. at 10; *see also* Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"), Plaintiff's Memorandum in Support of Opposition to Motion for Summary Judgment ("Pl.'s Mem.") at 9 ("Mr. Schoepfle neither read nor looked over the draft, but started yelling at the Plaintiff that this was not what he wanted, that it was not right."). This

incident allegedly caused the plaintiff to visit the DOL's Health Unit. *Id.* The plaintiff further claims that beginning in October 1999, and continuing until her termination, the defendants were "engaged in monitoring the [p]laintiff's whereabouts, and her arrivals and departures from the DOL building during her customary working hours." Compl. at 11. She asserts that she is unaware of any other DOL employee being monitored in this manner. *Id.* However, defendant denies that either Schoepfle or Perez–Lopez requested that the plaintiff be monitored.[11] Def.'s Mem. at 25. And, according to the defendant, the plaintiff never reported that she was being monitored to either Schoepfle or Perez–Lopez so that they could remedy the situation. *Id.*

Finally, the plaintiff claims that,

from the moment [she] expressed an interest in the advertised [vacancy] position, ILAB began a series of harassing acts in an attempt to keep her from competing for the position. Management did everything in its power to tell her that this is not something she should do. So much that her supervisor told her directly that he didn't understand why she was applying for the position.

Pl.'s Facts ¶ 26 (internal quotation marks and citation omitted). In support of this contention, plaintiff states that Ash Cambetta ("Cambetta"), an employee of the defendant, witnessed Schoepfle's treatment of her and observed that "his actions [showed] 'hostility and agitation towards the [Plaintiff],' and '[attacked her] both personally and professionally' .... [He] completely downgraded her, not accepting any of her statements, so that she broke out in tears and rushed out of the room." Plaintiff's Memorandum in Support of Op-

---

11. The monitoring was allegedly conducted by Mr. Thomas Wright ("Wright"), a member of the defendant's clerical staff. Plaintiff's

Memorandum in Support of Opposition to Motion for Summary Judgment ("Pl.'s Mem.") at 22; Def.'s Mem. at 25–26.

position to Motion for Summary Judgment ("Pl.'s Mem.") at 10 (internal citations omitted). Furthermore, the plaintiff asserts that, beginning in 1994 and continuing throughout the remainder of her tenure, Schoepfle "used ethnic slurs such as 'spic,' when speaking about Hispanics to [her] ... [and] also told her that 'older females should not be in the field of economics,' and 'that older women didn't make it as managers.'" *Id.* (internal citations omitted); *see also* Deposition of Ana Gustave–Schmidt ("Gustave–Schmidt Depo.") at 30–31, 70–76.

## II. Standard of Review: Summary Judgment

Summary Judgment is generally appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In assessing a summary judgment motion, the Supreme Court has explained that a trial court must look to the substantive law of the claims at issue to determine whether a fact is "material," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and must treat a "genuine issue" as "one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action," *Sanders v. Veneman*, 211 F.Supp.2d 10, 14 (D.D.C.2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

While it is understood that when considering a motion for summary judgment a court must "draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true," *Greene v. Amritsar Auto Servs. Co.*, 206 F.Supp.2d 4, 7 (D.D.C.2002) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505), the non-moving party must establish more than "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position," *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. To prevail on a summary judgment motion, the moving party must demonstrate that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "Even when material facts are in dispute, however, summary adjudication may be appropriate if, with all factual inferences drawn in favor of the nonmovant, the movant would nonetheless be entitled to judgment as a matter of law." *Young Dental Mfg. Co. v. Q3 Special Prods., Inc.*, 112 F.3d 1137, 1141 (Fed.Cir.1997) (citing *Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570, 1572–73 (Fed.Cir.1994)). The District of Columbia Circuit has stated that the non-moving party may not rely solely on mere conclusory allegations. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir.1993). Thus, "[i]f the evidence is merely colorable ..., or is not significantly probative ..., summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## III. Legal Analysis

The defendant seeks summary judgment on the grounds that the plaintiff cannot establish the elements of any of her three claims—discrimination, retaliation, and hostile work environment.[12] The Court

---

12. The defendant also requests summary judgment based on the assertion that the

plaintiff failed to exhaust her administrative remedies for her non-selection and hostile

will address each claim separately, and, for the reasons set forth below, grant the defendant's motion for summary judgment.

## (A) *Plaintiff's Discrimination Claims With Respect to Her Non–Selections*

■ The standard for evaluating discrimination claims pursued in the absence of direct evidence of discrimination was articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[13] To establish a prima facie case of discrimination with circumstantial evidence, a plaintiff is required to demonstrate "that: '(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Stella v. Mineta,* 284 F.3d 135, 145 (D.C.Cir.2002) (quoting *Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999)). Should the plaintiff prove her case by a preponderance of the evidence, the burden of production then switches to the defendant to provide a

"legitimate nondiscriminatory reason for its actions." *Id.* at 144 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). "If the employer is able to satisfy this burden of production, 'it [effectively] rebuts the plaintiff's prima facie case, and the presumption of discrimination created by the prima facie case 'drops out of the picture.'" *Buggs v. Powell,* 293 F.Supp.2d 135, 140 (D.D.C.2003) (Walton, J.) (internal citations omitted). The burden then switches back to the plaintiff to show that the "employer's stated reason was pretextual and that the true reason was discriminatory." *Stella,* 284 F.3d at 144 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–8, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817); *see also Buggs,* 293 F.Supp.2d at 140.

[O]nce the plaintiff establishes his prima facie case and the employer has met its burden of producing [ ] nondiscriminatory reasons for its actions, the focus of the proceeding ... will be on whether

work environment claims. Def.'s Mem. at 17–20. The Court need not, however, address this argument because it concludes, as discussed below, that the plaintiff has failed to meet her evidentiary burdens on these claims. Nonetheless, the Court notes that the defendant points out in her Reply that the plaintiff's allegations regarding Schoepfle's use of "ethnic slurs such as 'spic,' when speaking about Hispanics to plaintiff, ... that 'older females should not be in the field of economics,' and 'that older women didn't make it as managers,' were raised for the first time in the plaintiff's April 2003 deposition". Reply at 12–13. This is particularly troubling because, if true, it is clearly strong evidence of a discriminatory animus by Schoepfle, yet the plaintiff failed to ever mention these allegations even though she had been pursuing these claims, beginning at the administrative level, for approximately four years. The defendant notes that the plaintiff failed to ever mention this powerful evidence: (1) at a May 10, 1999 grievance regarding her hostile work environment claim; (2) at a May 2, 2001 arbitration hearing on her hos-

tile work environment claim; (3) at a November 1999 grievance regarding her termination; (4) at a February 2000 arbitration proceeding regarding her termination; (5) in her grievance related to her non-selection for the labor economist position; (6) at an April 18, 2001 arbitration hearing related to her non-selection for the labor economist position; (7) in a July 15, 1999 Formal Complaint of Discrimination based on her non-selection for the economist position; (8) in her March 31, 2003 responses to the defendant's interrogatories in which the defendant asked the plaintiff to specifically state each alleged act of discrimination, state all the facts on which she based her allegations, and to state each alleged act of harassment; and (9) in her complaint filed with this Court. *Id.* at 13–14.

13. The Court notes that the plaintiff does not claim to have direct evidence of discrimination and, in fact, analyzes her claim under the *McDonnell Douglas* burden-shifting test for circumstantial evidence.

the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (*such as independent evidence of discriminatory statements or attitudes on the part of the employer*) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment). That is not to say that every plaintiff must always present evidence in each of these categories in order to avoid summary judgment.

*Buggs,* 293 F.Supp.2d at 140 (quoting *Aka v. Wash. Hosp. Ctr.,* 156 F.3d 1284 (D.C.Cir.1998) (en banc)) (emphasis added). In assessing whether the plaintiff has met her "burden of showing that a reasonable jury could conclude that she had suffered discrimination and accordingly summary judgment is inappropriate[,]" a court "must consider all the evidence in its full context[.]" *Aka,* 156 F.3d at 1290. The *Aka* Court concluded that "[a]lthough we find that rebuttal evidence alone will not always suffice to permit an inference of discrimination, we do not endorse a reading of *Hicks* under which employment discrimination plaintiffs are presumptively required to submit evidence over and above such a rebuttal in order to avoid summary judgment." *Id.* at 1292. In reaching this conclusion, the Circuit Court rejected a position taken by the First Circuit in *Hidalgo v. Overseas Condado Insurance Agencies, Inc.,* 120 F.3d 328 (1st Cir.1997), stating:

the *Hidalgo* court believed that employment-discrimination plaintiffs must as a routine matter do more than discredit the employer's explanation in order to avoid summary judgment. That assumption we think would be inconsistent

with *Hicks,* which makes clear that 'no additional proof of discrimination is required' as a matter of course once a plaintiff has shown that a jury could reject the employer's proffered explanation.

*Aka,* 156 F.3d at 1292 (quoting *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742) (citations omitted).

The Court need not spend much time on whether the plaintiff has established a prima facie case of discrimination, as the defendant seemingly acknowledges that the plaintiff meets this burden as she "moves for summary judgment because the record demonstrates that the selection decision was based on legitimate, non-discriminatory business reasons and not for any unlawful discriminatory or retaliatory purpose." Def.'s Mem. at 20. The Court does note that it is undisputed that the plaintiff is a member of protected classes (over forty, female, Hispanic, and originally from El Salvador), *see* Def.'s Mem. at 20–21; Pl.'s Mem. at 25, and the defendant acknowledges that the plaintiff was not selected for the positions of Labor Economist (Vacancy 99–029) and Economist (Vacancy 99–032), even though she was deemed qualified for the position by the defendant. *See* Def.'s Mem. at 21; Surreply at 24. With respect to the second step of the *McDonnell Douglas* test, the plaintiff acknowledges "that the defendant has met its preliminary burden of articulating a legitimate nondiscriminatory/non-retaliatory reason for the challenged action." Pl.'s Mem. at 24. Therefore, the plaintiff's discrimination claim rises and falls on whether or not the defendant's reason was simply a pretext for discrimination.

■ "Title VII ... does not authorize a federal court to become 'a super-personnel department that re-examines an entity's business decisions.'" *Barbour v.*

*Browner,* 181 F.3d 1342, 1346 (D.C.Cir. 1999) (citing *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986)); *see also Buggs,* 293 F.Supp.2d at 144. Rather, as this Court reiterated in *Buggs:*

> [i]n cases involving a comparison of the plaintiff's qualifications and those of the successful candidate, we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone. In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call. But this does not mean that a reasonable juror would in every case defer to the employer's assessment. If that were so, no job discrimination case could ever go to trial. If a factfinder can conclude that a reasonable employer would have found the plaintiff to be *significantly better qualified* for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

293 F.Supp.2d at 144 (quoting *Aka,* 156 F.3d at 1294 (internal citation omitted)) (emphasis added). Thus, in deciding whether the defendant's proffered reason was pretextual, the Court must not question the employer's selection decision on the basis of qualifications, but instead, decide whether there is sufficient evidence of discrimination offered to show that the defendant's stated reason was a pretext. *Id.*

### (1) *The Labor Economist Position (Vacancy 99–029)*

█ The written vacancy announcement for the labor economist position listed the job as a GS–11/12/13 classification level. To be hired as a GS–12, a Ph.D. or equivalent doctoral degree or one year of specialized experience equivalent to a GS–11 was required. And, to be hired as a GS–13, the candidate must have one year of experience equivalent to at least the GS–12 level. Def's Mem. at 20. The announcement also stipulated that a combination of education and experience would meet the job qualification requirements. *Id.* Finally, the defendant

> undertook an extensive nationwide search to recruit capable candidates who had experience in labor economics and economic development ... In particular, defendant was looking for someone with knowledge of advanced statistical and economic techniques; skill in economic research sufficient to produce policy advice and published articles for the economics profession; skill in using statistical programming packages; advanced knowledge in the areas of labor markets, labor economics, developmental economics and international trade; and an ability to communicate research findings orally and in writing to technical and non-technical audiences.

*Id.* (internal citation omitted).

The plaintiff has a Ph.D. as well as a Masters degree in economics (both from the University of Texas). Her resume lists employment with the DOL, the International Labor Office, the University of Texas at Austin, and the United Nations. Surreply, Exhibit ("Ex.") 73 (Resume of Ana Gustave–Schmidt). In addition, the plaintiff submits that "she had been using advanced statistical and econometric techniques in her doctoral thesis and in her [published] articles ... [and that she] had

skill in economic research sufficient to produce public policy advice and publish articles for the economic profession." Pl.'s Mem. at 27 (internal citations omitted). And, insisting that she met all the qualifications requested in the vacancy announcement, plaintiff alleges that she "had advanced knowledge in the areas of labor markets, labor economics, development economics and international trade." *Id.* Recommendations written for the plaintiff corroborated her qualifications. Pl.Ex. 73 (Job Application of Ana Gustave–Schmidt).

The successful applicant, Susan Razzaz, was expected to receive her Ph.D. in May of 1999 in economics upon the completion and presentation of her doctoral thesis. She also had a masters degree, although not in economics. Her resume reflects past employment at Brown University, The World Bank's Poverty Reduction and Economic Management Network, the Watson Institute for International Studies, the Division of Capital Planning, and Habitat for Humanity & Comite Evangelico Pro Ayuda A1 Desarollo in Nicaragua. Pl.Ex. 73 (Resume of Susan Razzaz). Like the plaintiff, Razzaz received supporting letters of recommendation. Pl.Ex. 73 (Job Application of Susan Razzaz). In addition, Razzaz "demonstrated extensive experience working on 'complex components of labor issues related to the economic development of several emerging nations.'" Def.'s Mem. at 21–22 (citation omitted). The record reflects that, like the plaintiff, Razzaz clearly met all the specifications indicated in the vacancy announcement, from statistical techniques and programming knowledge to communication skills and public policy advisement. Pl.Ex. 73 (Resume and Job Application of Susan Razzaz). As such, this Court cannot conclude that the plaintiff was "significantly better qualified" than was Razzaz for the position at issue.

■ Another member of this Court stated in *Vasilevsky v. Reno,* 31 F.Supp.2d 143 (D.D.C.1998), that

> [i]t is the plaintiff's duty to put forth evidence of discrimination, not to "quibble about the candidates' relative qualifications" ... It is not within the court's province to second-guess an employer's choice of candidates ... Even if the plaintiff did prove that she were better qualified that, without more, would indicate nothing more than a faulty hiring decision ... Such evidence would not indicate that the plaintiff failed to obtain the position in question because of her age ... "Unless the employer's choice of candidates can be shown to have been tainted by unlawful discrimination, it must be allowed to stand, no matter how unwise it may seem to the disappointed applicant" ... Consequently, the plaintiff's opinion of the relative merits of her credentials as opposed to those of the selected individuals are irrelevant.

*Id.* 150 (internal citations omitted). Thus, the plaintiff must produce sufficient evidence that demonstrates that she did not receive the position offered to Razzaz because of her age, gender, ethnicity, or her national origin.

Aside from her claim that she was more qualified than the selected applicant, the plaintiff alleges as proof of discrimination the fact that the Merit Certificate List used in the selection process for the labor economist position was altered to add Razzaz's name. Surreply at 19. An examination of this list does in fact reveal that Ms. Razzaz's name was added to the list, as her name was typed on the form. Def.'s Mot., Ex. 25 (Merit Certificate List for Labor Economist Position). However, the defendant contends that the panel who certified the applicants on the list initially forgot to forward Ms. Razzaz's application to Traci Orange, the personnel staffing

specialist who was involved in the selection process. Reply at 24. In fact, Ms. Orange drafted a contemporaneous memorandum noting that the "[c]ertificate was amended to add Susan Razzaz because the panel forgot to return her application with the other applications. The panel returned the application upon recognizing the error and Ms. Razzaz was added to the certificate." Reply, Ex. 40 (March 23, 1999 Memorandum for the File). And, at her deposition, Ms. Orange explained how the panel members misplaced Ms. Razzaz's application, necessitating the amendment of the Merit Certificate List. *Id.* (Traci Orange Deposition). Of particular significance is the fact that the panel was comprised of two individuals—Mr. Sheppard and Mr. Dobson—and not Schoepfle. *Id.* While the plaintiff makes the bald assertion "that Schoepfle was the individual that added the name of Razzaz in the Merit Certificate List[,]" Surreply at 21, there is nothing in the record to suggest this was the case.

Accordingly, because the Court cannot conclude that the plaintiff was "significantly better qualified" for the position at issue than was Razzaz, and the plaintiff has failed to adduce any evidence of discrimination by the defendant, the Court will grant summary judgment to the defendant on this claim.

### (2) *The Economist Position (Vacancy 99–032)*

██ With respect to her non-selection for the economist position, the plaintiff asserts that she "had objectively superior professional credentials (both educational and job experience) to [Daniel] Carroll." The plaintiff notes that Carroll was not an economist, like the plaintiff who has a Ph. D. in economics, but was nonetheless selected for such a position. Surreply at 26. The plaintiff also contends that her ability

"clearly exceeded" that of Carroll in knowledge of the Spanish language, which was one of the qualification factors that would be considered, as the plaintiff "is a native Spanish speaker." *Id.* An examination of the vacancy announcement for this position reveals that the position description included, in pertinent part:

> Manages a DOL-sponsored national random survey of employed crop workers called the National Agricultural Workers Survey (NAWS). Supervises the design of questionnaires, training of interviewers, implementation of the survey, and analysis of the result. Some of this w[ork] occurs in a Spanish Language environment.

Surreply, Ex. 83 (Merit Staffing Vacancy Announcement 99–032). The announcement also states the applicant should have an economics degree or a combination of economics education and experience. *Id.* Dr. Richard Mines, who was the lead interviewer for this position, stated in a sworn affidavit that the selecting officials were

> impressed with all three of [non-selected] candidates['] qualities, experiences and outside activities. However, we did not feel they could compete with Daniel Carroll in this particular position. Carroll had extensive experiences doing surveys among farmworkers both for farmworker and for grower groups. He was familiar with the environment and the life conditions of both the growers and the workers. He had been a farmworker himself as a young man and had been a farmer. His references were unvarying in their praise. This included representatives from the grower and worker advocate communities, plus from the academic world where he had collected and analyzed farmworker statistics. The other three in question did not have references from the farm community be-

cause, as far as I know, they did not have such experience.

Reply, Ex. 45 (Affidavit of Dr. Mines).

A review of Carroll's application reveals his past work experiences that are directly related to this position, such as his prior jobs as Study Coordinator for Occupational Injury in Migrant Hispanic Farmworker Families and postgraduate researcher in a study of labor management and safety practices of 140 agricultural employers in California. Surreply, Ex. 84 (Carroll Application). And, Carroll received a Masters Degree in Science in International Agricultural Development, with an emphasis in Agricultural Economics.[14] *Id.* The plaintiff's application, while impressive in the general field of economics, has little connection to farmworkers. *Id.* (Gustave–Schmidt Application). In a situation like this, the Court is in no position to second-guess the defendant's selection of Carroll over the plaintiff. While the plaintiff may be more qualified in the general area of economics, clearly Carroll's past experiences with farmworkers was directly relevant and made him particularly attractive to Dr. Mines for a position that would entail managing a survey of employed crop workers. Accordingly, the Court will have to grant the defendant summary judgment on this claim as well.

**(B)** *Plaintiff's Claim that her Termination was Retaliatory*

■ Retaliation claims are subject to the same burden-shifting analysis of *McDonnell Douglas* as disparate treatment claims. *See Buggs,* 293 F.Supp.2d at 147. "To establish a prima facie case of retaliation under Title VII in this Circuit, a plaintiff must establish that (1)[s]he en-

gaged in EEO-protected activity; (2)[s]he was subject to adverse action by [her] employer; and (3) there is a causal connection between the protected activity and the adverse action." *Id.* (citing *Paquin v. Fed. Nat'l Mortgage Ass'n,* 119 F.3d 23, 31 (D.C.Cir.1997)).

■ In this case, it is undisputed that the plaintiff engaged in protected activity by filing grievances against her employer for hostile work environment and discriminatory conduct and that she suffered adverse employment action when she was removed from federal service. Thus, the issue then facing the Court is whether the plaintiff can establish a causal connection between her grievances she filed and her termination. In *Buggs,* this Court noted that "if a plaintiff relies upon temporal proximity alone to establish causation, the time span must be *under* three months." 293 F.Supp.2d at 148 (citation omitted) (emphasis added); *see also Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing *O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1253 (10th Cir.2001) (holding that three (3) months time is insufficient to establish temporal proximity)). Here, the last grievance prior to Schoepfle's recommendation to remove the plaintiff from her position was filed on July 15, 1999. Schoepfle made his proposal to terminate the plaintiff on October 13, 1999, and it was further supported by Perez–Lopez on November 23, 1999, after he undertook an independent review of the plaintiff's performance. Shoepfle recommended that the plaintiff be terminated two days short of three months following the filing of her July 1999 complaint, which clearly pushes the temporal requirement in a retaliation

---

**14.** Carroll's Application reflects that he completed 36 hours of agricultural economics course work plus 6 semester hours of statistics. Surreply Ex. 84 (Carroll's Application).

This far surpasses the education requirements listed in the vacancy announcement of 21 hours of course work in economics and 3 semester hours of statistics. Surreply Ex. 83.

case to its outer limit. The viability of the plaintiff's retaliation claim need not be resolved on this potential impediment, however, because even if the plaintiff could establish a prima facie case of retaliation, the Court finds that the defendant clearly meets its burden of providing a legitimate, non-discriminatory reason for terminating the plaintiff's employment. Here, the defendant claims that the plaintiff was terminated because "[t]he seriousness of [her] offense, the wholesale copying of work done by others was so serious ... [that] termination was the appropriate action." Def. Ex. 3, Transcript of Arbitration on February 15, 2000, Testimony of Dr. Jorge Perez–Lopez, at 174. Thus, the defendant has clearly met its burden of providing a legitimate non-discriminatory/non-retaliatory reason for the plaintiff's termination.

Furthermore, of particular significance to the Court is that while the recommendation to terminate the plaintiff was initially made by Schoepfle, whom plaintiff alleges made discriminatory and derogatory remarks against her, the termination was supported after an independent review of the documents in question by Perez–Lopez, who has not been shown to have engaged in any discriminatory behavior. Although the plaintiff argues repeatedly that she never claimed authorship for the papers upon which the defendant based its decision to terminate her, *see* Pl.'s Facts ¶¶ 6, 8, the defendant's conclusion that she misrepresented the papers as her own was reasonable because she placed her name on the cover pages of the documents and she never explicitly denied authorship to her Supervisor. *See* Reply at 2. Moreover, she never attributed authorship of the articles to the organizations which produced them. *Id.* Based on these circumstances, Perez–Lopez independently reviewed the papers and arrived at the same conclusion as Schoepfle, namely, that the plaintiff misrepresented the submitted papers as

her own. Def.'s Mot., Ex. 3 (Deposition Testimony of Perez–Lopez). During his deposition, Mr. Perez–Lopez testified that he "reviewed very carefully the two papers, the one on the Asian Crisis in Latin America; and also the one about Economic Integration in the Americas. And I was amazed at how these documents are almost a hundred percent identical." *Id.* at 170. Perez–Lopez further testified that he "read all [the] documents and based on [his] reading all of the documents, they justified fully Mr. Schoepfle's proposal." *Id.* at 173. In *Griffin v. Washington Convention Center*, 142 F.3d 1308 (D.C.Cir. 1998), the District of Columbia Circuit noted that "[w]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissible [sic] basis, the bias of the subordinate is not relevant." *Id.* at 1311 (quoting *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir.1997)). Absent any evidence illustrating a discriminatory motive on Perez–Lopez's part, or collusion by Perez–Lopez and Schoepfle to reach the same conclusion about the plaintiff's termination, the plaintiff's denial of the misrepresentation charge is insufficient to prove that the reason offered by the defendant was a pretext for discrimination. *See Phillips v. Holladay Property Services, Inc.*, 937 F.Supp. 32, 35 n. 2 (D.D.C.1996) (" 'the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a ... [discrimination] claim to withstand a motion for summary judgment' ") (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir.1992) (citations omitted)). Therefore, the Court will grant summary judgment in favor of the defendant on the plaintiff's retaliation claim.

**(C)** *The Plaintiff's Hostile Work Environment Claim*

To establish a prima facie case under Title VII that a hostile work environment was created by the actions of a supervisor, the plaintiff must demonstrate that: "(1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term[,] condition or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Felton v. Polles,* 315 F.3d 470, 484 (5th Cir.2002) (citation omitted); *see Tademe v. Saint Cloud State Univ.,* 328 F.3d 982, 991 (8th Cir.2003) (citation omitted). "Hostile work environment claims based on ... sexual treatment" are treated similarly to those based on racial harassment. *Nat'l R.R.Passenger Corp. v. Morgan,* 536 U.S. 101, 116, n. 10, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (citing *Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). And, age-based hostile work environment claims are analyzed under the same standard. *See Bryant v. Brownlee,* 265 F.Supp.2d 52, 63 (D.D.C.2003). In *Morgan,* the Supreme Court indicated that a plaintiff must demonstrate that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'" 536 U.S. at 116, 122 S.Ct. 2061 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). To be actionable, the conduct at issue must objectively and subjectively create a hostile or abusive work environment. *See Faragher,* 524 U.S. 775, 118 S.Ct. 2275.

In assessing whether a hostile work environment claim is viable, a court must "look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367). In *Stewart v. Evans,* 275 F.3d 1126 (D.C.Cir. 2002), the District of Columbia Circuit stated:

> Title VII is not a 'general civility code for the American workplace,' *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) .... Rather a workplace becomes hostile for the purposes of Title VII only when offensive conduct 'permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.' *Barbour v. Browner,* 181 F.3d 1342, 1347–48 (D.C.Cir.1999) (quoting *Oncale,* 523 U.S. 75, 118 S.Ct. 998). In determining whether harassment rises to this level, courts should consider the frequency of the harassing conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Harris,* 510 U.S. at 21–23, 114 S.Ct. 367. Except in extreme circumstances, courts have refused to hold that one incident is so severe to constitute a hostile work environment. *See Tatum v. Hyatt Corp.,* 918 F.Supp. 5, 7 (D.D.C.1994) (citations omitted). Even a few isolated incidents of offensive conduct do not amount to actionable harassment. *See, e.g., Hopkins v. Baltimore Gas & Electric Co.,* 77

F.3d 745, 753 (4th Cir.1996) ('holding that the fact that alleged incidents were spread over a seven-year period suggested that the harassment was not sufficiently pervasive to establish[ ] Title VII liability'); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) ('holding that nine incidents spread over seven months did not constitute sexual harassment because the supervisor never touched employee and incidents were not sufficiently severe or pervasive').

275 F.3d at 1133–34.

■ In this case, the plaintiff alleges that she was subjected to a hostile work environment because: (1) she was falsely accused of forgery and subjected to an investigation and possible suspension; (2) she was closely monitored and followed by a co-worker; (3) she was yelled at by her Supervisor in April of 1999 in close proximity to her fellow co-workers; and (4) her Supervisor "used ethnic slurs such as 'spic,' when speaking about Hispanics to [her] ... [and] also told her that 'older females should not be in the field of economics,' and 'that older women didn't make it as managers.'" Pl.'s Mem. at 10 (internal citations omitted); *see also* Pl.'s Opp'n, Ex. 3 (Deposition of Ana Gustave–Schmidt) at 30–31, 70–76. However, the Court finds that these alleged incidents, taken in a light most favorable to the plaintiff, did not significantly alter the plaintiff's working conditions and are therefore insufficient to establish a prima facie case of a hostile work environment.

First, the plaintiff is unable to show that being subjected to an internal investigation or allegedly being monitored by a co-worker had an adverse effect on her employment. In *Mack v. Strauss*, 134 F.Supp.2d 103 (D.D.C.2001), the court noted that "the fact that plaintiff believes [s]he was isolated [for investigation or charges of wrongdoing] does not constitute a materially ad-

verse consequence or disadvantage in the terms and conditions of h[er] employment so as to establish an adverse personnel action." *Id.* at 114 (citing *Williams v. City of Kansas City*, 223 F.3d 749, 754 (8th Cir.2000)). Similarly, the Court finds that the April 1999 yelling incident and the purported use of ethnic slurs, sexist comments and inappropriate statements about age by Schoepfle are insufficient to establish that a "sufficiently severe or pervasive" environment was created which altered the plaintiff's working conditions. *Morgan*, 536 U.S. at 116, 122 S.Ct. 2061 (citation omitted). A review of several cases where courts have found the absence of a hostile work environment, despite the existence of undeniably crass behavior, illustrates this point.

In *Tatum v. Hyatt Corp.*, the district court held that "an isolated incident did not so alter the plaintiff's employment conditions as to create a hostile work environment ... [even though] the plaintiff's co-worker unexpectedly wrapped his arms around the plaintiff's neck and body, rubbed against her as if to simulate sex, made comments about her physical attractiveness, and placed a piece of ice in plaintiff's skirt pocket." 918 F.Supp. at 6–7; *see Stewart*, 275 F.3d at 1131–36 (affirming district court's dismissal of "Title VII claims—sexual harassment and retaliation—for reasons stated in Memorandum Opinion filed by the district court ..." which was attached by the Circuit Court as the "Appendix." District court relied on *Tatum* in concluding that conduct complained about did not create a hostile work environment.). In *Li Li Manatt v. Bank of America*, 339 F.3d 792 (9th Cir.2003), the Ninth Circuit addressed a hostile work environment claim by a Chinese–American woman based on events that occurred over a span of two-and-a-half years. There, numerous comments, which were some-

times accompanied by laughter, were made by several of the plaintiff's co-workers either to the plaintiff herself or within her earshot, including, but not limited to: "I am not a China man, I'm not like China man with their eyes like that[,]" "China woman, China woman, China woman, get your butt over here[,]" and "China man" and "rickshaw." *Id.* at 795. In addition, on some of these occasions after these statements were made, the co-workers would "pull[ ] their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians." *Id.* The Ninth Circuit found that "[u]nder our case law, this conduct was neither severe or pervasive enough to alter the conditions of [plaintiff's] employment." *Id.* at 799 (citations omitted). In *Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir.2003), the Ninth Circuit recently addressed a hostile work environment claim by a probation officer who was told by a co-worker that he had "a typical Hispanic macho attitude," should work in the field because "Hispanics do good in the field" and was yelled at in front of others. *Id.* at 642–43. In finding that these events did not constitute a hostile work environment, the Court noted that these incidents occurred over the course of more than one year and the events were not severe or pervasive enough to violate Title VII. *Id.* at 643. The *Vasquez* Court noted that in *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir.1990), it affirmed the dismissal of a hostile work environment claim involving allegations that "the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino." *Vasquez*, 349 F.3d at 643 (citing *Sanchez*, 936 F.2d at 1031, 1036). In addition, the *Vasquez* Court commented

that in *Kortan v. California Youth Authority*, 217 F.3d 1104 (9th Cir.2000), no hostile work environment was found "when a supervisor called female employees 'castrating bitches,' 'Madonnas,' or 'Regina' on several occasions in plaintiff's presence . . . [and] called plaintiff 'Medea[.]'" *Vasquez*, 349 F.3d at 643–44 (citing *Kortan*, 217 F.3d at 1107).

The above cases must be compared with other cases where courts have found plaintiffs' claims sufficient to constitute a hostile work environment. In *Kang v. U. Lim America, Inc.*, 296 F.3d 810 (9th Cir. 2002), a Korean plaintiff was found to have suffered national origin harassment where his supervisor

subjected [the plaintiff] and other Korean workers to verbal and physical abuse and discriminatorily long work hours. The verbal abuse consisted of[the supervisor] screaming at [the plaintiff] for up to three hours a day and calling him 'stupid,' 'cripple,' 'jerk,' 'son of a bitch,' and 'asshole.' The physical abuse consisted of striking [the plaintiff] in the head with a metal ruler on approximately 20 occasions, kicking him in the shins, pulling his ears, throwing metal ashtrays, calculators, water bottles, and files at him, and forcing him to do 'jumping jacks.' [And when the plaintiff] began to cut back on the required overtime in order to spend time with his pregnant wife [ ] [the supervisor] fired him.

*Id.* at 814 (footnote omitted). In *Nichols v. Azteca Restaurant Enterprises*, 256 F.3d 864 (9th Cir.2001), a hostile work environment claim was established where an effeminate male employee

was subjected to a relentless campaign of insults, name-calling, and vulgarities. Male co-workers and a supervisor repeatedly referred to [him] in Spanish and English as 'she' and 'her.' Male co-workers mocked [the plaintiff] for walk-

ing and carrying his serving tray 'like a woman,' and taunted him in Spanish and English as, among other things, a 'faggot' and a 'fucking female whore.' The remarks were not stray or isolated. Rather, the abuse occurred at least once a week and often several times a day [throughout his tenure from October 1991 to July 1995].

*Id.* at 870. Finally, in *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104 (9th Cir. 1998), a hostile work environment was found where the plaintiff's supervisor at first began to refer to the plaintiff not by name, but as "beautiful" and "gorgeous." *Id.* at 1105. However, the supervisor's comments later

took on a decidedly sexual tone. He told [the plaintiff], for example, that his sex life with his wife was not very good and that he wished he had met [the plaintiff] before he had married. He also told [the plaintiff] about his sexual fantasies, including his desire to have sex with both [her] and his wife. This conduct escalated and became more unbearable .... During a safety meeting with the entire crew, for example, [the supervisor] asked what a Mexican prostitute was called and joked that the answer was 'a frijole.' Several times he remarked about [the plaintiff's] 'ass' and commented to other members of the crew that 'it would be fun to get into [her] pants.' On one occasion, the crew had been working in the rain, and when [the plaintiff] went to the locker room to change out of her wet clothes, [the supervisor] used the loudspeaker to ask whether she needed any help changing clothes and announced that several guys were willing to provide assistance. On another occasion, he walked up from behind her as she was shoveling dirt and told her to 'be careful who you bend over in front of.' Another time, [the plaintiff] had just taken off a sweatshirt

that she was wearing over her regular work shirt and [the supervisor] asked over the loudspeaker whether that was all she was going to take off.

*Id.* at 1105–06. This conduct took place throughout the plaintiff's employment of two years. *Id.* at 1105.

In this matter, the plaintiff has not presented sufficient evidence that would rise to the level of a hostile work environment because she is unable to show that the "workplace [was] permeated with 'discriminatory intimidation, ridicule, and insult,' that [was] 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'" *Morgan,* 536 U.S. at 116, 122 S.Ct. 2061 (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367). What occurred in this case, when compared with the cases outlined above, clearly falls within the former category of cases. And while the Court does not condone the alleged behavior, it just cannot be said to have created a hostile work environment.

During her deposition, the plaintiff testified that

Schoepfle was constantly humiliating me. I was humiliated on a continuous basis. He was making fun of the way I speak. He was telling me that the field of economics is not for females, that he had married a female that was an economist and he divorced, so he made many statements that were very offensive to me as a female. He was saying to me that other wom[en aren't] good managers and then I was feeling very bad about his comments, especially about his racial slurs, about my Hispanic accent and the way I speak.

Pl.'s Opp'n, Ex. 3 at 30. When asked about the instances in which the plaintiff felt humiliated, she responded that Schoepfle "was always making fun of the

way I speak and he was calling *them* spics when he was referring to Hispanics, so in all my relationship with him, I was constantly humiliated and put down." *Id.* at 30–31 (emphasis added). The plaintiff testified that this occurred "during the tenure that I had with Mr. Schoepfle in the years '94, '95, and all this was done through our work relationship." *Id.* at 31. In addition, the plaintiff also stated that Schoepfle "made statements about older [women] that shouldn't be in the field of economics." *Id.* at 68. While the Court recognizes that Schoepfle's purported use of ethnic slurs, sexist comments, and inappropriate age statements would cause the plaintiff discomfort, there is insufficient evidence in the record that these comments rose to the level of creating a hostile work environment for several reasons. First, Schoepfle's comments about the way the plaintiff spoke falls into the " 'simple teasing' and 'offhand comments' category of non-actionable discrimination." *Manatt,* 339 F.3d at 798 (plaintiff "ridiculed . . ." for mispronouncing 'Lima.'). Second, there is nothing in the record to suggest that Schoepfle's references to Hispanics as "spics" and "statements about older [women] that shouldn't be in the field of economics" were even directed at the plaintiff. *Cf. id.* (noting that "on only a couple of occasions did [the plaintiff's] co-workers or supervisor direct their racially insensitive 'humor' at [the plaintiff].").  In any event, the Court finds that the uttering of these racial slurs, sexist comments, and inappropriate age statements were "not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—[and is thus] beyond Title VII's purview." *Harris,* 510 U.S. at 21, 114 S.Ct. 367; *see Bundy v. Jackson,* 641 F.2d 934, 943 n. 9 (D.C.Cir.

1981) (commenting that "casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action").  Accordingly, the Court finds that it must also grant the defendant's summary judgment motion on the plaintiff's hostile work environment claim.

## IV.  *Conclusion*

For the aforementioned reasons, the Court will grant the defendant's motion for summary judgment. This is because the defendant has articulated a legitimate non-discriminatory reason for the plaintiff's two non-selections and her termination. In addition, the plaintiff's allegations of a hostile work environment fail to rise to the requisite level of conduct sufficient to constitute an actionable claim. Accordingly, the Court will dismiss this case.[15]

## *ORDER*

Upon consideration of the defendant's motion for summary judgment, and for the reasons set forth in the Memorandum Opinion accompanying this Order, it is hereby,

**ORDERED** that the defendant's motion for summary judgment is **GRANTED**. It is **FURTHER ORDERED** that this case shall be **DISMISSED WITH PREJUDICE**.

15.  An Order consistent with the Court's ruling accompanies this Memorandum Opinion.